Filed 3/6/24  Peoples Homeless Task Force Orange County v. City of Anaheim CA4/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| PEOPLES HOMELESS TASK FORCE ORANGE COUNTY, | G061422 |
| Plaintiff and Appellant, | (Super. Ct. Nos. 30-2020-01135406, 30-2020-01174133) |
| v. | |
| CITY OF ANAHEIM, | O P I N I O N |
| Defendant and Respondent. | |

Appeal from a judgment of the Superior Court of Orange County, David A. Hoffer, Judge.  Affirmed in part and reversed in part.

Law Offices of Kelly A. Aviles, Kelly A. Aviles and Shaila Nathu, for Plaintiff and Appellant.

Robert Fabela, City Attorney, and Gregg M. Audet, Assistant City Attorney for, Defendant and Respondent.

\*          \*          \*

This appeal is from the denial of a petition for writ of mandate that sought injunctive relief arising from alleged violations of the Ralph M. Brown Act (Gov. Code, § 54950 et seq.; Brown Act) by the City of Anaheim (Anaheim) in connection with the since-aborted sale of Angel Stadium of Anaheim (Angel Stadium).[1] Plaintiff Peoples Homeless Task Force Orange County, which opposed the sale, is an advocacy group on behalf of unhoused people. Plaintiff contends Anaheim violated the Brown Act in several ways, with the result that the decision to sell Angel Stadium was arrived at behind closed doors, rather than in the public forum required by the Brown Act. Plaintiff raises five issues asserting various Brown Act violations, the first and primary being that the Anaheim City Council (City Council) deliberated about whether to sell versus lease Angel Stadium in closed sessions, which, in plaintiff's view, violated the Brown Act's requirement that deliberations occur in public. The trial court rejected all five of plaintiff's arguments, concluding no violations of the Brown Act occurred. Of the five issues plaintiff raises, we affirm as to four. However, we agree Anaheim improperly restricted public comment to e-mails at two meetings during 2020, and thus we reverse that aspect of the judgment. In all other respects, we affirm.

FACTS

Beginning in 1996, Anaheim leased what the parties refer to as the Stadium Site to the Angels Baseball Club (the Angels). The Stadium Site consists of approximately 150 acres, including Angel Stadium, the Grove of Anaheim, and related properties (such as parking). The lease permitted either party to terminate it upon 12 months written notice, a right the Angels exercised in October 2018.

This kicked off a series of negotiations between Anaheim and the Angels concerning what would become of the Stadium Site. The person leading the negotiations

_____

[1] All statutory references are to the Government Code unless otherwise stated.

2

on behalf of Anaheim was its City Manager Chris Zapata. In February 2019, at a public meeting, Anaheim retained the services of Norris Realty Advisers to perform an appraisal of the Stadium Site.

During 2019, Anaheim held a series of meetings regarding the negotiations, some of which were closed, others public. The relevant details of the meetings are addressed in the discussion section below.

On November 15, 2019, the Angels presented a proposal to Anaheim to purchase the Stadium Site. On December 6, Anaheim published notice of an upcoming meeting (on Dec. 20) at which Anaheim would consider the proposal to sell the Stadium Site to SRB Management Company, LLC (SRB), an entity that had just been formed by the Angels for the purpose of the sale.

On December 20, 2019, the City Council held a public meeting. After a lengthy period of public comment and deliberation by the City Council, it voted to approve the proposal to sell the Stadium Site. Following this approval, plaintiff filed its first petition for a writ of mandate seeking declaratory relief and nullification of the approval under the Brown Act.

On September 29, 2020, the City Council held another public meeting to consider a restated purchase proposal (which expressly superseded the first agreement) and related development agreement. This meeting was pre-publicized as the first one had been. In reliance on Governor Newsom's Covid-19 related Executive Order No. N-29-20, Anaheim held the meeting by teleconference, accessible to the public electronically and on cable television. The public was permitted to submit comments to the City Council via e-mail only. After extensive deliberations and a meeting lasting approximately six hours, the City Council approved the amended agreement. Because the development agreement required approval by ordinance, the City Council approved the first reading of such ordinance at the September 29, 2020 meeting and the second reading at a public meeting on October 6, 2020, which was likewise held by

3

teleconference. At the October 6 meeting, the public was again invited to submit comments via e-mail, which were forwarded to the City Council. At neither of these meetings were members of the public allowed to speak.

Following the approval of the restated agreement, plaintiff filed a second petition for writ of mandate because the restated agreement mooted any objection to the approval of the original agreement. After a period of discovery, plaintiff filed a motion for writ of mandate and declaratory relief regarding its Brown Act claims. Although the parties were given the option of presenting live testimony, both parties elected to submit the matter on declarations and documentary evidence.

While much of the evidence was undisputed, there was a key conflict in the testimony between, on the one hand, City Manager Chris Zapata and Councilmember Dr. Jose Moreno, and, on the other, City Attorney Robert Fabela. These two sides disagreed on whether the City Council made a decision to sell versus lease the Stadium Site while in closed session.

Zapata declared that on August 13, 2019, "'the City Councilmembers discussed whether to sell or continue the lease during the closed session and made the decision to sell the property to Angels Baseball during that closed session.'" At a September 24, 2019 closed session meeting, Zapata further declared, "'The City Council discussed and deliberated on the information provided in the updated appraisal, provided approval to sell the property to Angels Baseball, and authorized the City's Negotiating Team to conduct further negotiations consistent with the City Council's decision to sell the property.'"

Councilmember Moreno declared that in the August 13 closed session meeting, "Councilmembers discussed whether to sell or continue the lease during the closed session and, in expressing strong interest in selling the property to Angels Baseball, discussed the value of the then current appraisal to determine the value of the property in a for sale transaction." As for the September 24 closed session meeting,

4

Moreno declared, "'The City Council discussed and deliberated on the information provided in the updated appraisal, provided approval to sell the property to Angels Baseball, and authorized the City's Negotiating Team to conduct further negotiations consistent with City Council's decision to sell the property.'"

Those declarations were countered by City Attorney Fabela, who was present at both closed meetings and declared, "'There was no discussion of the merits between a sale or a lease transaction, or any "decision" or vote on what the ultimate form of the transaction would be. Indeed, the value of the property was still being evaluated, there was no proposal on the table from the Angels at that time, and the City would not receive any such proposal until November of 2019. Both before and after the meetings of August 13 and September 24, 2019, both a sale and a lease (or something else) were still potential options, with the ultimate form of the transaction still unknown.'" He further declared that "'the purpose of the August 13 and September 24, 2019, closed sessions was to discuss the appraisal of the property with the City's appraiser (Steve Norris), and to receive any direction regarding price and terms of payment.'"

The court ultimately concluded that Anaheim had not violated the Brown Act and denied plaintiff's petition. The court found that the Zapata and Moreno declarations were not credible on the sell versus lease issue. It found those declarations inconsistent with comments Councilmember Moreno made at the public meeting on December 20, 2019, in which Moreno claimed the City Council had never discussed whether to sell or lease. We address those comments in detail below. On the other hand, the court found the Fabela declaration to be credible, describing it as "extensive, comprehensive, densely detailed, and supported by other evidence in this case." Moreover, the court reasoned, "[E]ven if the Zapata and Moreno declarations were credible, the court finds the discussions allowable because the price of a sale and the basic property right being sold are inextricably interrelated — a legislative body cannot coherently discuss one without discussing the other."

5

The court rejected plaintiff's remaining contentions, which we discuss in detail below, and entered judgment in favor of Anaheim. Plaintiff timely appealed.

DISCUSSION

Plaintiff argues the trial court made several errors in resolving the Brown Act claims. We address each in turn.

*Substantial Evidence Supports the Court's Conclusion That There Were No Improper Discussions of Sale Verses Lease in Closed Sessions*

Plaintiff's first contention is the evidence established that Anaheim violated the Brown Act by holding discussions, in closed session, regarding whether to sell versus lease the Stadium Site. The trial court concluded no such discussions took place, but even if they had, they would not violate the Brown Act. We review the former factual finding for substantial evidence and conclude substantial evidence supports the court's conclusion that no discussions of sell versus lease took place in closed sessions. We therefore do not reach the issue of whether such discussions would have been permissible.

We begin with the legal context of the Brown Act. "The Brown Act is designed to encourage public participation in government decisionmaking by requiring that public agencies take action and conduct deliberations openly." (*Coalition of Labor, Agriculture & Business v. County of Santa Barbara Bd. of Supervisors* (2005) 129 Cal.App.4th 205, 208; see § 54950 ["It is the intent of the law that [legislative bodies'] actions be taken openly and that their deliberations be conducted openly"].)

However, the Brown Act contains exceptions to this public-deliberation requirement. The exception relevant to this case states, "Notwithstanding any other provision of this chapter, a legislative body of a local agency may hold a closed session with its negotiator prior to the purchase, sale, exchange, or lease of real property by or for

6

the local agency to grant authority to its negotiator regarding the price and terms of payment for the purchase, sale, exchange, or lease." (§ 54956.8.) The issue in this case is whether the City Council decided in closed session to sell, rather than lease, the Stadium Site, and, if so, whether that decision exceeded the discussion of "price and terms of payment" permitted in closed sessions by section 54956.8.

We conclude plaintiff has forfeited any substantial evidence challenge to the trial court's conclusion that no discussion of sale versus lease took place in closed session. In its opening brief, plaintiff devotes seven pages of argument to the proposition that the decision to sell versus lease exceeds the limited scope of "price and terms of payment" in the Brown Act—i.e., the trial court's secondary rationale. These seven pages present a legal argument that the decision to sell versus lease is not encompassed in the "terms of payment" as a matter of law.

Plaintiff's only partial recognition of a substantial evidence issue is a single paragraph at the end of that section, where plaintiff states, "Moreover, despite the fact that throughout the City made inconsistent arguments regarding whether discussing the merits of a sale versus lease in closed session occurred, the trial court embraced the City Attorney's declaration and shunned the declarations of former City Manager Zapata and Councilmember Moreno as 'not credible' and relied solely on the Declaration from City Attorney Fabela, who was and still is employed by the City. [Citation.] Yet, such a ruling was not supported by any evidence. Moreover, it ignores that a defendant's employees are not 'disinterested witnesses.'"

Naturally, Anaheim pointed out in its respondent's brief that plaintiff's argument "completely disregard[ed] the substantial evidence supporting the trial court's finding" and "essentially fail[ed] to even address the trial court's adverse factual findings and assessment of witness credibility. . . ." In its reply brief, plaintiff sets forth five pages of detailed arguments concerning why the court's credibility findings were not based on substantial evidence.

7

Plaintiff's tactic of barely mentioning substantial evidence in the opening brief, and instead reserving detailed arguments for the reply brief, results in a forfeiture for multiple reasons.

As a general matter, arguments raised for the first time in a reply brief are forfeited. "'Obvious considerations of fairness in argument demand that the appellant present all of his points in the opening brief. To withhold a point until the closing brief would deprive the respondent of his opportunity to answer it or require the effort and delay of an additional brief by permission. Hence the rule is that points raised in the reply brief for the first time will not be considered, unless good reason is shown for failure to present them before.'" (*Neighbours v. Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 335, fn. 8.)

While it is true plaintiff made an oblique reference to the conflict in the evidence in its opening brief, that is not sufficient to raise a substantial evidence argument for our consideration. California Rules of Court, rule 8.204(a)(1)(B)-(C) requires each brief to "[s]tate each point *under a separate heading* or subheading summarizing the point, and support each point by argument and, if possible, by citation of authority; and (C) [s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears." (Italics added.) "Appropriate headings require litigants to '"present their cause systematically and so arranged that those upon whom the duty devolves of ascertaining the rule of law to apply may be advised, as they read, of the exact question under consideration, instead of being compelled to extricate it from the mass."'" (*United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 153.) "Failure to provide proper headings forfeits issues that may be discussed in the brief but are not clearly identified by a heading." (*Pizarro v. Reynoso* (2017) 10 Cal.App.5th 172, 179.)

Here, not only did plaintiff fail to include a heading dedicated to a substantial evidence argument, but the passing argument it made did not develop the

argument with citations to the record or to authority and instead simply made conclusory statements. There was no good cause for this blatant omission. The court's primary rationale on this issue was that discussions of sell versus lease did not occur in closed session. That is a factual issue. The court explained its reasoning at some length in its statement of decision, so this could not have been overlooked by plaintiff. Moreover, the fact that plaintiff presented detailed arguments on the substantial evidence question in its reply brief shows that it had such arguments to make, but simply reserved them, raising serious questions about gamesmanship and significantly prejudicing Anaheim's ability to respond, and, by extension, our ability to properly analyze the issue. Accordingly, the issue is forfeited.

In any event, there was ample substantial evidence to support the court's conclusion. We start with the obvious: Fabela attested that he was present in all of the closed sessions, and the decision whether to sell versus lease was not discussed in any of them. Fabela explained that he was careful to instruct the City Council on the limitations of what they could discuss at the meetings—price and terms of payment. Further, he explained that the sell versus lease issue was not a live issue at that point because the closed sessions occurred before the Angels made their offer to purchase the Stadium Site. The trial court credited this testimony.

"'A single witness's testimony may constitute substantial evidence to support a finding. [Citation.] It is not our role as a reviewing court to reweigh the evidence or to assess witness credibility.'" (*Ribakoff v. City of Long Beach* (2018) 27 Cal.App.5th 150, 162.) In its reply brief, plaintiff makes various arguments to attack the credibility of Fabela. However, the Court of Appeal is not a forum for resolving factual disputes. The weight and credibility to be given to Fabela's declaration was solely the province of the trial court: "We do not judge credibility on appeal." (*In re Marriage of Boswell* (2014) 225 Cal.App.4th 1172, 1175.) There was nothing inherently incredible about Fabela's testimony.

9

Fabela's testimony was consistent with Councilmember Moreno's comments at a public meeting on December 20, 2019, which was after the closed sessions at issue. During that public meeting, Councilmember Moreno stated (contrary to his later declaration) it was the first time the City Council had discussed the decision of whether to sell or lease the Stadium Site. Moreno stated, "This is the first public discussion—the first discussion I should say—that the City Council has actually had on the actual deal points. Because in closed session the City Attorney [i.e., Fabela] was very good in making sure we focused on the price and terms of payment per the Brown Act. So this is the first time we've had a chance to discuss, deliberate, understand fully together in public—actually just with each other—the major deal points here." Plaintiff emphasizes the word "public"—but Councilmember Moreno corrected himself after using that word. In essence, he said it was the first public discussion—nay, the first discussion at all—of the deal points. The trial court was free to adopt this interpretation, which furnishes substantial evidence that the sell versus lease discussion did not occur in closed session.

Since we conclude that substantial evidence supports the court's finding that no discussion of sale versus lease occurred in closed session, we need not address whether such discussions would have violated the limited scope of permissible deliberations in closed session.

*Substantial Evidence Supports the Court's Conclusion That No Negotiating Team Was Formed*

Plaintiff's second contention is that Anaheim formed a negotiating team that itself constituted a public body subject to the Brown Act and that violated the Brown Act by operating behind closed doors. The trial court concluded no such team was created. We find substantial evidence supports that conclusion.

The Brown Act applies to "legislative bod[ies]," which means "[t]he governing body of a local agency or any other local body created by state or federal

10

statute." (§ 54952, subd. (a).) That definition extends to any "decisionmaking or advisory" committees formally created by a legislative body. This makes sense: a legislative body cannot evade the Brown Act with the simple expedient of creating a subcommittee. Specifically, the Brown Act applies to: "A commission, committee, board, or other body of a local agency, whether permanent or temporary, decisionmaking or advisory, created by charter, ordinance, resolution, or formal action of a legislative body." (*Id.*, subd. (b).)

The factual context of this issue is as follows: Prior to June 2019, City Manager Zapata had spearheaded discussions with the Angels, bringing in other Anaheim staff as necessary. At a public City Council meeting on June 4, 2019, Zapata provided a report on the status of those discussions. After Zapata's report, Mayor Harry Sidhu stated: "[W]e are still in early stage talks about the future of baseball in Anaheim, but it is critical for us to see progress this year. When discussion[s] begin, we must be ready, so I am establishing a lead negotiating team for the City. It will be including myself as a Council representative. I am pleased to have our City Manager Chris Zapata and City Attorney Rob Fabela join me on behalf of the City administration. We go into this with one goal: an agreement that is good for the resident[s] first, and that also works for the team."

Notwithstanding the mayor's public remarks, the City Council took no action regarding the creation of an alleged "team" at the meeting on June 4, 2019. The matter was further discussed at the City Council meeting on June 18, 2019, where two dissenting councilmembers (including Moreno) decided to "self-appoint" to the negotiating team, stating that if Mayor Sidhu could do so, they could too. But again, no formal action was taken.

At the City Council meeting on July 16, 2019, the issue of appointing a councilmember to participate in negotiations was formally placed on the agenda for the first time as follows: "Select a member of the City Council to work in conjunction with

11

City staff as the exclusive Council representative for negotiations . . . ." At that meeting, the City Council voted to appoint Mayor Sidhu in that capacity. Zapata contemporaneously described the effect of this appointment as follows: "Although the designated City Council representative will work closely with the City Manager and the executive staff on negotiations, and will be the exclusive representative of the City Council in negotiations, the entire City Council, as well as the public, will continue to receive briefings and updates from the City Manager on the negotiations as appropriate. Furthermore, any final outcomes or agreements will need to be brought forward and considered by the full City Council at future City Council meetings."

The question before us is whether this action created a legislative body. We agree with the trial court that it did not. Notwithstanding Mayor Sidhu's earlier ineffectual pronouncement about a "negotiating team," the actual resolution adopted by the City Council simply made an *individual* appointment of Mayor Sidhu to represent the City Council in any future meetings with the Angels, and also to work with unspecified Anaheim staff in the course of the negotiations. It did not create a "commission, committee, board, or other body" under section 54952, subdivision (b). Mayor Sidhu was not delegated any decision-making powers, nor was he given any particular advisory task. He was simply a representative, not a legislative body. Accordingly, his interactions with Anaheim staff were not subject to the Brown Act.

*Substantial Evidence Supports the Court's Conclusion that No Improper Serial Communications Took Place*

The Brown Act, which generally requires the public's business to be conducted in public, prohibits evading its requirements by utilizing a series of private individual conversations to deliberate. Section 54952.2, subdivision (b)(1), provides, "A majority of the members of a legislative body shall not, outside a meeting authorized by this chapter, use a series of communications of any kind, directly or through

12

intermediaries, to discuss, deliberate, or take action on any item of business that is within the subject matter jurisdiction of the legislative body." However, the statute immediately goes on in subdivision (b)(2) to provide a clarification: "Paragraph (1) shall not be construed as preventing an employee or official of a local agency, from engaging in separate conversations or communications outside of a meeting authorized by this chapter with members of a legislative body in order to answer questions or provide information regarding a matter that is within the subject matter jurisdiction of the local agency, if that person does not communicate to members of the legislative body the comments or position of any other member or members of the legislative body."

Plaintiff contends the City Council violated these rules. The principal evidence supporting this contention is the declaration of Zapata, which, as discussed above, the court found not credible. Zapata attested, "During my tenure as City Manager, the City of Anaheim had a consistent practice of conducting briefings on City business with Councilmembers. These briefings were sometimes offered by staff, and at times were by Councilmember request. . . . During these briefings, councilmembers received factual updates and information regarding specific issues. Councilmembers could also ask questions about items on the agenda or items of business before the City and staff would provide information and answers to those questions." "Councilmembers received such briefing(s) during late 2018 and 2019 regarding the Angels Stadium negotiations. I specifically recall meeting with Councilmembers Stephen Faessel, Jose Moreno, and Jordan Brandman to discuss aspects of the stadium negotiations. During these meetings, in addition to receiving information, the Councilmembers provided information on aspects of the Stadium negotiations that they wanted to see included in the final agreement."[2]

_____

[2] Councilmember Moreno provided a declaration that contained similar, albeit less detailed, information.

13

The trial court found this evidence did not establish that unlawful serial communications took place. It reasoned, "To the extent the vague declarations of Zapata and Moreno indicate there were discussions of the stadium site, they clearly fall within the Section 54952.2[, subdivision] (b)(2) exception for individual briefings. Both declarations describe staff as answering questions and providing information and neither says anything about communicating 'to members of the legislative body the comments or position of any other member or members of the legislative body.' Thus it appears that any discussions that *did* occur, were, at most, part of the ordinary give-and-take of council work and not a prohibited attempt to circumvent open meeting laws." The court also noted Zapata's declaration did not establish communications with *a majority* of the City Council, which is what section 54952.2, subdivision (b)(1) prohibits.

The court's interpretation of Zapata's declaration was well reasoned and grounded in its own credibility determinations. This was, again, ultimately a factual issue, and we must defer to the trial court's reasonable inferences drawn from the evidence, as well as its conclusion that the declarations were vague and thus accorded little weight.

Plaintiff responds that there is a dearth of evidence in the record of the City Council discussing certain deal points, "for example, how long the Angels would commit to playing in Anaheim, how many home games the Angels would commit to playing at the Stadium (which would lead to tax revenue for the City), the geographical boundaries of the Stadium Site, what developments (e.g., affordable housing, public parks) what, if any, rights, the City would retain with regard to the Stadium Site, and how the City would be protected if any aspect of the deal fell through." Plaintiff goes on, "But if these discussions never took place in closed session and never took place in open session, a logical question is whether they occurred in a series of communications between individual councilmembers and City staff."

14

That question may have been an interesting one at trial, but on appeal, in the face of a substantial evidence standard, plaintiff must do far more than raise questions. We presume the judgment to be correct and it is the appellant's burden to affirmatively demonstrate error. (*Randall v. Mousseau* (2016) 2 Cal.App.5th 929, 935.) Plaintiff has not pointed to any evidence that would *compel* the trial court to find that improper serial communications occurred as a matter of law. Accordingly, we conclude substantial evidence supports the court's determination.

*The Agenda Descriptions for the Closed Sessions Complied with the Brown Act*

Next, plaintiff contends the agendas for closed sessions held on August 13, September 24, November 19, and December 3, 2019, contained inadequate and inaccurate information. We disagree.

Under the Brown Act the public is entitled to advance notice of the issues to be discussed or acted upon at a city council meeting, and it receives this notice through a pre-posted agenda. The agenda must provide a general description of the topics to be addressed. (§ 54954.2, subd. (a)(1) ["A brief general description of an item generally need not exceed 20 words"].) It must be posted at least 72 hours in advance (*ibid.*), and, with few exceptions, "[n]o action or discussion shall be undertaken on any item not appearing on the posted agenda" (*id.*, subd. (a)(3)).

Section 54954.5, subdivision (b), provides a template for an agenda description of a closed session to discuss price and terms of payment with a negotiator regarding a real estate transaction: "CONFERENCE WITH REAL PROPERTY NEGOTIATORS [¶] Property: (Specify street address, or if no street address, the parcel number or other unique reference, of the real property under negotiation) [¶] Agency negotiator: (Specify names of negotiators attending the closed session) (If circumstances necessitate the absence of a specified negotiator, an agent or designee may participate in place of the absent negotiator so long as the name of the agent or designee is announced

15

at an open session held prior to the closed session.) [¶] Negotiating parties: (Specify name of party (not agent)) [¶] Under negotiation: (Specify whether instruction to negotiator will concern price, terms of payment, or both)." (§ 54954.5, 5, subd. (b).)

Anaheim's agenda for its closed sessions closely tracked that template: "CONFERENCE WITH REAL PROPERTY NEGOTIATORS [¶] (Section 54956.8 of California Government Code) [¶] Property: 2000 E. Gene Autry Way and 2200 E. Katella Ave., Anaheim, CA 92806; [¶] APN Nos. 232-011-02, -06, -35, -36, -37, -38, -39, -40, -41, -42, -43, -44, -47, -48, -50 [¶] Agency Negotiatior: Chris Zapata, City Manager [¶] Negotiating Parties: Angels Baseball, LP; City of Anaheim Under Negotiation: Price and Terms of Payment." (Boldface omitted.)

Plaintiff has two critiques of this agenda. First, it did not identify the "negotiating team." However, as we discussed above, the court's finding that there was no negotiating team was supported by substantial evidence. Second, in identifying the negotiating parties, the agenda lists Angels Baseball, LP, rather than SRB, the special purpose entity the Angels created for this transaction.

We note at the outset that SRB was not even created until November 20, 2019, and thus, at most, plaintiff's argument applies solely to the December 3, 2019, meeting. With regard to that meeting, the trial court held the agenda was "practically correct because all the negotiations involved the same people, whether called SRB or the Angels." "Here, the agendas describing the Angels (a far more descriptive term than SRB) as the negotiating party . . . easily meet the substantial compliance standard."

"The law disregards trifles." (Civ. Code, § 3533.) Failing to identify SRB, rather than the Angels, is not only a trivial defect, but it would have been counterproductive to identify SRB, as most residents know the Angels, but could not be expected to know who SRB was at the time. Moreover, even if SRB was going to be the legal rights holder, the actual negotiating party (and real party in interest) was, in fact, the

16

Angels.  Accordingly, by listing the Angels as the negotiating party, Anaheim fully complied with its duties under section 54954.5, subdivision (b).[3]

*Restricting Public Input to E-mail Violated the Brown Act*

Plaintiff's final contention is that Anaheim improperly restricted public comment to e-mails at the public meetings on September 29 and October 6, 2020.  We agree.

The Brown Act requires public bodies to meet and conduct their business in public.  At public meetings, a legislative body must "provide an opportunity for members of the public to *directly address* the legislative body on any item of interest to the public . . . that is within the subject matter jurisdiction of the legislative body . . . ." (§ 54954.3, subd. (a), italics added.)

In response to the COVID-19 pandemic, on March 17, 2020, Governor Gavin Newsom issued Executive Order No. N-29-20 (Executive Order).  The Executive Order authorized legislative bodies "to hold public meetings via teleconferencing and to make public meetings accessible telephonically or otherwise electronically to all members of the public seeking to observe and to address the" body and waived "[a]ll requirements in . . . the Brown Act expressly or impliedly requiring the physical presence of members, the clerk or other personnel of the body, or of the public as a condition of participation in or quorum for a public meeting . . . ."  "A local legislative body or state body that holds a meeting via teleconferencing and allows members of the public to observe and address the meeting *telephonically or otherwise electronically*, consistent with the notice and accessibility requirements set forth below, shall have satisfied any

---

[3] Plaintiff takes issue with the trial court applying a substantial-compliance standard.  We need not address that issue, however, as we conclude Anaheim fully complied with its obligations regarding the agenda.

17

requirement that the body allow members of the public to attend the meeting and offer public comment." (Italics added.)

In response to the Executive Order, Anaheim held teleconferenced public meetings on September 29 and October 6, 2020. The meetings were accessible to the public via cable television or the Internet. With regard to the public's ability to directly address the City Council, Anaheim set up an e-mail address where the public could submit written comments, and the comments were forwarded to the entire City Council by e-mail. At the September 29 meeting, 274 comments were received and forwarded. At the October 6 meeting, 369 comments were received and forwarded. So far as the record reveals, these comments were not read aloud during the meeting.

Plaintiff contends this procedure did not comply with the requirement to permit the public to directly address the City Council. Anaheim contends its procedure was permissible under the Executive Order, which only required a procedure whereby the public could address the City Council "telephonically or otherwise electronically . . . ." In Anaheim's view, e-mail satisfies the "otherwise electronically" prong. The trial court agreed with Anaheim.

We agree with plaintiff. The Executive Order did not suspend the requirement that the public have the opportunity to *directly address* the City Council. To the contrary, the Executive Order preserves this requirement by acknowledging a legislative body's obligation to allow members of the public to "address the meeting" and "offer public comment." The expression "otherwise electronically" has to be read in the context of the statutory opportunity to directly address the City Council, and that phrase must be read in its entirety: "*telephonically* or otherwise electronically . . . ." (Italics added.) In other words, the public had to be permitted to call in or use an electronic means of similarly addressing the meeting to offer public comment.

18

The e-mail procedure Anaheim employed did not satisfy this requirement. Under even the most generous interpretation, an e-mail sent ahead of the meeting and forwarded to the City Council outside of the meeting does not constitute addressing the meeting. Moreover, e-mail simply does not capture the essence of directly addressing a city council. As most everyone has experienced at this point, e-mail is easily and often ignored. Indeed, given the large quantity of e-mail comments received at the meetings in this instance, the temptation to ignore some of these comments may well have been strong. By contrast, when a member of the public approaches the microphone at a city council meeting, looks the councilmembers in the eye, and makes a statement to a captive audience, there is no question that the city council hears the comment. The technology to implement such a system electronically was readily available at that time via Internet teleconferencing. Indeed, it is now legally required that, where teleconferencing is used, "The legislative body shall not require public comments to be submitted in advance of the meeting and must provide an opportunity for the public to address the legislative body and offer comment in real time." (§ 54953, subd. (e)(2)(C).) While that law was not yet in place when the meetings at issue here were held, we believe it expresses the correct interpretation of the Brown Act as modified by the Executive Order in 2020. Accordingly, we reverse the aspect of the judgment finding no Brown Act violation in the e-mail procedure.

19

## DISPOSITION

The judgment is reversed to the extent it found no Brown Act violation occurred when Anaheim restricted public comment to e-mails for the public meetings on September 29 and October 6, 2020.  In all other respects, the judgment is affirmed.  The parties shall bear their own costs on appeal.


                                        SANCHEZ, J.

WE CONCUR:


GOETHALS, ACTING P. J.


GOODING, J.

20